## JACKSON WOOLEN MILLS v. MOORE et al.

(Court of Civil Appeals of Texas. Texarkana. Jan. 30, 1913. On Motion for Rehearing, Feb. 27, 1913.)

1. CORPORATIONS (§ 661*)—FOREIGN CORPORATIONS—RIGHT TO SUE.

Where a foreign corporation sold goods to a mercantile company in this state, the sale being interstate commerce, it could sue on a contract afterwards made with the mercantile company and other of such company's creditors in the adjustment of its demands against such company, though it had not procured a permit to transact business in this state, as required by Rev. Civ. St. 1911, art. 1318, of foreign corporations.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2536, 2539, 2542–2544, 2546, 2563–2567; Dec. Dig. § 661.*]

### On Motion for Rehearing.

2. CONTRACTS (§ 221*)—CONSTRUCTION.

Plaintiff sold goods to a mercantile company, which became unable to pay its debts, whereupon plaintiff and other creditors signed a contract by which the mercantile company agreed to sell its assets to certain persons at the price named. The agreement provided that each creditor should have the right, until 12 o'clock noon, on a day fixed, in which to determine whether or not he would participate with the vendees in said purchase in the proportion that his claim bore to the total indebtedness, and that the failure of any creditor to notify the vendees before the time fixed of his selection to participate in said purchase should conclude such creditor. *Held*, that a creditor, desiring to become a pro rata purchaser of the debtor's goods, was required to give notice of his intention before noon of the day fixed, not having a reasonable time thereafter to notify the principal purchasers of such intention.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1015–1032; Dec. Dig. § 221.*]

Appeal from Smith County Court; Jesse F. Odom, Judge.

Action by the Jackson Woolen Mills against A. P. Moore and others. From judgment for defendants, plaintiff appeals. Affirmed.

R. E. Bozeman and W. W. Campbell, both of Alba, for appellant. D. T. Bomar, of Ft. Worth, and Fitzgerald, Butler & Bulloch, of Tyler, for appellees.

WILLSON, C. J. There is no statement of facts with the record. From findings made by the court it appears that the Quitman Mercantile Company, a Texas corporation, was indebted to various persons in sums it could not pay. Appellant, a Tennessee corporation doing business in Nashville, had there sold goods to the mercantile company for which the latter had not paid. At a meeting of creditors of the mercantile company, held at Mineola, Tex., September 27, 1910, an agreement in writing was entered into between said mercantile company and appellees Moore and Bomar, as follows: "An agreement made on the 27th day of Sept., 1910, between the Quitman Mercantile Company, hereinafter called the vendor, and A. P. Moore, of Tyler, Texas, and D. T. Bomar of Ft. Worth, Texas, hereinafter called the vendees. The vendor is the owner of a stock of general merchandise inventoried at about $8,000, notes and accounts of about $3,000, and a storehouse in Quitman valued at $1,000. The vendor has liabilities of approximately $12,000, and is unable to meet its liabilities as they mature. Its creditors, or a majority of them, have agreed that the total value of its assets is the sum of $4,000. The vendees are willing to purchase same at said price. For a valuable consideration the vendor and the vendees have agreed with respect thereto as follows: First. The vendor has and does hereby agree to sell to the vendees the entire assets of the vendor of every kind and character, including the liability of the stockholders of said company to it for unpaid subscriptions of the capital stock thereof, and including all cash on hand, free and clear in incumbrances, at the price of $4,000, payable in cash, and the vendees have and do hereby agree to purchase said assets and to pay for same in cash at said prices as aforesaid. Second. This transaction to be consummated just as quickly as the names and residences of the creditors of the

vendor can be ascertained and their ratification obtained. Third. Each of the creditors of the vendor shall have the right until 12 o'clock, noon, on Monday, Oct. 3, 1910, in which to determine whether or not he, she, or it, shall participate with the vendees in said purchase in the proportion that his, her, or its, claim shall bear to the total indebtedness of the vendor, and on the failure of any creditor to notify the vendees at their respective addresses on or before the time hereinbefore fixed of his, her, or its, selection to so participate in said purchase shall conclude such creditor. In witness whereof," etc. Following the signatures of the mercantile company and Moore and Bomar to the agreement was the following: "We, the undersigned creditors of the vendor, hereby consent to the sale evidenced by the agreement to which this is attached. [Signed] Taylor Bros., by W. M. Campbell, Att'y; Litchfield Clo. Co., by W. M. Campbell, Att'y; Jackson Woolen Mills, by W. M. Campbell, Att'y," and other creditors of the mercantile company. The court further found that on September 28, 1910, Bomar, acting for himself and for Moore, prepared and mailed to each of the mercantile company's creditors, including appellant, a letter as follows: "Dear Sir: At a meeting of the creditors of the Quitman Mercantile Company, held at Mineola, Texas, at 1 o'clock p. m. at the office of Hart & Hart, on September 27, 1910, at which there was present the representatives of about 70% of the creditors of said company, it was unanimously agreed by all creditors present that the best interest of all parties at interest was to sell the assets of said company then and there, and at the best price obtainable, and in pursuance of this an agreement was entered into between the Quitman Mercantile Company, A. P. Moore of Tyler, Texas, and D. T. Bomar of Fort Worth, Texas, by which said company sold to Moore and Bomar all of the assets of said company at the price of $4,000 cash, with the agreement and understanding that the transaction should be consummated as quickly as possible and that each creditor of the Quitman Mercantile Company should have the right, until noon of Monday, October 3, 1910, in which to determine whether or not he, she, or it, would participate in the benefits of said purchase in the proportion that their debt should bear to the total liabilities of the company. A statement made up by a man named Craddock, at the instance of the stockholders of said company, showing: merchandise on hand, including fixtures, $8106.48; store house and lot in Quitman, $1000; outstanding accounts, $3272—total $12179.04. And accounts due to various creditors, including banks, of approximately $12000. I therefore advise you of these facts with the request that you at once signify your approval of the transaction, and that you advise at once whether or not you desire to become one of the purchasers of the property with Mr. Moore and myself on the basis above indicated, or whether you will accept your pro rata share of the proceeds of the sale." By a telegram delivered to the Western Union Telegraph Company at Jackson, Tenn., at 11:36 o'clock a. m. of October 3, 1910, and a letter, properly addressed and stamped, deposited in the post office at Jackson before noon of said October 3, 1910, appellant notified appellees of its acceptance of the offer to permit it to become a purchaser of the property with them. The telegram was delivered at appellee Bomar's office in Ft. Worth at 12:35 p. m. of October 3, 1910, and the letter in due course of the mails. On said October 3, 1910, appellees sold the property they had purchased of the mercantile company for $4,000 in accordance with the agreement for about $6,000, and afterwards refused to permit appellant to share with them as a purchaser in the profits of the transaction, notwithstanding appellant's ability and willingness to pay its proportionate part of the purchase price to the mercantile company. Appellant thereupon commenced this suit, setting out in its petition the facts recited, and praying a recovery against appellees in the sum of $300 as its damages. The court construed the contract set out as requiring notice of appellant's acceptance of the offer to permit it to become a purchaser with them of the property, to be given appellees before noon of October 3, 1910, and because such notice did not reach them before that hour, and also because he was of the opinion that appellant, being a foreign corporation, must have complied with articles 1314 et seq. of the Revised Statutes of 1911 to be entitled to maintain the suit, determined appellant was not entitled to recover as sought, and rendered judgment in favor of appellees.

A majority of the court are of the opinion that the contract between the mercantile company and appellees should be construed to mean that appellant as one of the creditors of the mercantile company had until 12 o'clock noon of October 3, 1910, to determine whether it would become a purchaser with appellees of the property of the mercantile company or not, and a reasonable time thereafterwards to notify appellees of the fact if it desired to become such a purchaser. In reaching this conclusion weight was given by the majority of the court to the fact that in the letter dated September 28, 1910, Bomar stated that by the terms of the contract each creditor of the mercantile company had "until noon of Monday, October 3, 1910, in which to determine whether or not he would participate in the benefits of the purchase," and said nothing about the provision in the contract that "the failure of any creditor to notify the vendees at their respective addresses on or before the time hereinbefore fixed (to wit, 12 o'clock, noon, of Monday, October 3, 1910), of his selection to

so participate in said purchase shall conclude such creditor." The writer thinks the contract should be construed as requiring appellant before the hour specified, not only to determine whether it wished to become such a purchaser or not, but also, if it determined it did, to notify appellees of the fact. It seems to him that the language used in the third paragraph of the contract indicates such to have been the intention of the parties with sufficient clearness, and that the construction given it by appellees, even if their said letter should be treated as one construing the meaning of the contract, should not be given any effect in determining their rights. Determining a given matter is a mental operation, the result of which can be known only by words or conduct of the party entitled to determine it. When the parties used the word "determine" in the third paragraph of the contract, they evidently did not contemplate that the conclusion reached by the creditor might lie concealed in his mind until the time specified. They must have contemplated that the creditor, having reached a conclusion, should make it known before that time. That they did contemplate that, the writer thinks, is clearly shown by the stipulation in the same paragraph that "the failure of any creditor to notify" before the time specified should operate to deprive him of the right to become a purchaser with appellees of the property. But, if the contract should be treated as ambiguous, and if weight, therefore, should be given to the construction placed upon it by the parties, the writer is of the opinion that the letter referred to should not be held to show that appellees construed it to mean what the majority of the court have determined it did mean. By its indorsement thereon in writing, made at the time the contract was entered into, appellant consented to its terms, and thereby became a party to it. It knew the contents thereof as well as appellees knew them, and could not claim to have been misled by anything in, or omitted from, the letter; and it was specially requested in the conclusion of the letter to "at once" advise appellees whether it desired to become one of the purchasers of the property or not. In view of this request, keeping in mind that appellees were writing about a contract appellant was a party to, the writer does not think the letter meant, nor that appellant had a right to assume it meant, that appellees construed the contract to mean that appellant had until 12 o'clock noon of October 3d to determine whether it would become a purchaser with them or not, and a reasonable time thereafterwards in which to notify them of the fact. To his mind the request rather indicated appellees had not so construed it, but desired that the conclusion reached by appellant should be made known to them before the time specified in the contract.

[1] We agree that the conclusion reached by the court below that appellant, because a foreign corporation, was not entitled to maintain its suit was erroneous. The court found as a fact that the sale of the goods by appellant to the mercantile company was interstate commerce, and therefore that appellant was entitled to maintain a suit against that company for the price thereof, notwithstanding it had not procured a permit to transact business in this state; but, having also found that appellant had not procured a permit to transact business in this state, and that the contract between the mercantile company and appellees covering the purchase of the goods "was signed by the plaintiff by its attorney, W. M. Campbell, and that same was made in the state of Texas to be performed within the limits of said state, and in no respect involved the transaction of interstate commerce," concluded appellant could not maintain its suit against appellees. Discussing the statute (article 1318, Rev. Stat. of 1911) invoked to support the judgment, which denies to a foreign corporation a right to maintain a suit in the courts of this state upon any demand, unless it has filed its articles of incorporation for the purpose of procuring a permit to transact business in this state, the Supreme Court said: "The purpose of the statute was probably twofold: One to protect the people of the state from irresponsible foreign corporations by affording the means by which they could readily ascertain such information in reference to them as is ordinarily afforded by their charters; the other to place them upon the same footing as like domestic corporations by requiring them to pay a like fee for a permit to do business as is required of a domestic corporation for filing its charter. See Rev. Stat. art. 2439. It is to be presumed, therefore, that the business had in view in making the requirement was the ordinary business of the company— the business it was organized to pursue, and which its charter empowered it to pursue. Had it been intended to prohibit a foreign corporation from collecting, extending, adjusting, or bringing suit for a debt contracted elsewhere, it would have been easy to have made that intention plain. If it was the purpose of article 745 (1314 of the Rev. Stat. 1911) to deny the corporation the comity which is usually extended throughout the states of the Union of bringing suits in the courts of this state, article 746 (1318 of the Rev. Stat. 1911) was wholly unnecessary. On the other hand, that article shows that such was not the purpose. It, in effect, merely denies the right of a foreign corporation to bring suit upon any cause of action arising after it had done business in the state without a permit, thus showing that it was regarded that bringing a suit in court was not doing business within the purview of article 745. If bringing suit to collect a debt be not doing business within the meaning of the provision in question, how can the adjust-

ment of a debt be such business." Security Co. v. Bank, 93 Tex. 580, 57 S. W. 23. The facts in the case cited were that the Wichita Roller Mill Company, a Texas corporation, had borrowed of a loan company, also a Texas corporation, the sum of $7,000, for which it executed its bond, and to secure same had given the loan company a mortgage on its property. The loan company, through a broker in Connecticut, sold the bond to the security company, a Connecticut corporation. The mill company having failed to pay the bond, the security company recovered a judgment against it in a Texas court for the sum of $8,806.36, and foreclosing the mortgage on the mill company's property. The Panhandle National Bank, having a mortgage on the same property, but subject to the one made to the loan company, to prevent a sale of the property agreed with the security company to pay it all but $7,000 of its judgment, and, the mill company being insolvent, to have a new milling company to assume the payment of the $7,000 and secure same by a mortgage on the same property. This was accordingly done. In the mortgage made to the security company by the new milling company the latter bound itself to keep certain buildings covered by the mortgage insured for the benefit of the security company. The suit was on two policies of insurance issued to the bank at a time when it was the legal owner of the buildings, but payable, in case of loss, to the security company as its interest might appear. The court held that the transaction between the parties whereby the security company extended the time for the payment of the debt due it and took new security for same was an adjustment of its claim which it had a right to make without procuring a permit to transact business in this state, and that it had a right to maintain its suit against the insurance companies, the new milling company, and the bank. We think the facts of this case bring it within the ruling made by the Supreme Court in the case cited. It was in the adjustment of its demand against the mercantile company that appellant became a party to the contract between that company and appellees, and we think it could maintain a suit to enforce rights it acquired under that contract, notwithstanding it had not procured a permit to transact business in this state.

The conclusion reached necessitates a reversal of the judgment; and as the court found that appellant, if it had been treated as a purchaser with appellees of the mercantile company's property, would have realized the sum of $278.90, there is no reason why the cause should be remanded for a new trial. Therefore judgment will be here rendered that appellant recover of appellees said sum of $278.90, 6 per cent. interest thereon from October 3, 1910, and the costs of this court and the court below.

### On Motion for a Rehearing.

[2] Having considered the question again, we are of opinion the court below did not err when he construed the contract as requiring appellant, if it desired to become a purchaser with appellees of the goods, to notify them of the fact before noon of October 3, 1910. The testimony being undisputed that appellant did not so notify appellees, we are further of the opinion that the judgment of the court below denying appellant a recovery as sought by it was not erroneous. It follows that we think the action of this court in setting aside the judgment of the court below was erroneous. Therefore the motion for a rehearing will be granted, the judgment heretofore rendered by us will be set aside, and the judgment of the court below will be affirmed.